IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 3, 2021

## STATE OF TENNESSEE v. SHANTHONY MAYS

**Appeal from the Circuit Court for Obion County**
**No. CC-18-CR-173       Donald E. Parish, Judge**

_____

### No. W2020-00201-CCA-R3-PC

_____

The Petitioner, Shanthony Mays, filed a petition for post-conviction relief challenging his convictions for aggravated robbery, aggravated assault, and unlawful possession of a weapon and the resulting twelve-year sentence. The post-conviction court denied relief, and the Petitioner appeals. On appeal, the Petitioner alleges the following: (1) that he provided new evidence establishing an improper jury venire; (2) that trial counsel was ineffective by failing to provide statistical information to show the systematic exclusion of African-Americans in the jury venire of Obion County; (3) that trial counsel was ineffective by failing to properly examine the State's witnesses regarding the admissibility of evidence and impeachment; (4) that trial counsel was ineffective by failing to file a pretrial motion regarding the chain of custody for "tainted evidence"; and (5) that the post-conviction court should have given more weight to the co-defendant's recantation of his trial testimony. After our review, we affirm the judgment of the post-conviction court denying the Petitioner relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Paul R. Hutcherson, Dresden, Tennessee, for the appellant, Shanthony Mays.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and Melinda Meador, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

# TRIAL

Following a jury trial, the Petitioner was convicted of one count of aggravated robbery, three counts of aggravated assault, and one count of unlawful possession of a weapon. See Tenn. Code Ann. §§ 39-13-101, -13-102, -13-402, -17-1307. He was sentenced to an effective twelve-year sentence to be served consecutively to his sentence in an unrelated case. See State v. Shanthony Tywon Mays, No. W2016-01390-CCA-R3-CD, 2017 WL 3841372, at *1 (Tenn. Crim. App. Aug. 31, 2017), perm. app. denied (Tenn. Jan. 23, 2018).

At trial, testimony indicated that on the night of May 15, 2014, Sharmen Twining and Samantha Milligan were working at the 3J's Food Mart ("3J's") in Union City. Mays, 2017 WL 3841372, at *1. At approximately 11:30 p.m., two men dressed in black entered the store and demanded that everyone get on the floor. Tina Webb and her daughter were also in the store at this time. One of the men had a gun, which both Ms. Twining and Ms. Milligan described as black. Ms. Twining testified that she did not see the men's faces and lost consciousness while she was on the floor. Ms. Milligan had been in the kitchen when she heard the commotion. When she leaned out to see what the noise was, one of the men pointed the gun at her and told her to get on the ground. The other man pushed Ms. Webb's daughter to the ground and used her as a prop to jump over the cashier's counter. He then rummaged through some items before both men fled from the store. Ms. Milligan called the police and woke Ms. Twining. Upon awakening, Ms. Twining saw coins on the floor and noticed that the cash bag was missing. The bag read "City State Bank" and contained $1,050.

Don Walker was parked outside of 3J's around 11:30 p.m. on the night of May 15, 2014. Mays, 2017 WL 3841372, at *1. He had stopped to buy some food and noticed two young men "running up the sidewalk [] toward the door." Id. Mr. Walker testified that one man had on a dark-colored hoodie and the other had on a light-colored hoodie. He saw one man pull a gun while inside the store and the other man grab money from behind the counter. According to Mr. Walker, the entire incident lasted "maybe [twenty], [thirty] seconds" and the men left in the same direction from which they had come. Id.

Officer James Key of the Union City Police Department was dispatched to 3J's on the night of May 15, 2014. Mays, 2017 WL 3841372, at *1. Officer Key had received a description of two Black male suspects dressed in black with bandanas over their faces. Officer Key used a spotlight to search surrounding areas and spotted two men near the back of Union City Elementary School. This was approximately three hundred yards from 3J's. Id. at *2. Officer Key exited his car and told the two men to walk towards the car with their hands up. Officer Key observed that the Petitioner had a bandana tied around his

-2-

neck. The two men, the Petitioner and Jimal Williams, were taken into custody and placed in separate patrol cars.

Officer Key, along with other officers, began looking for clothing that may have been discarded. Mays, 2017 WL 3841372, at *2. Ultimately, a red money bag, a white cotton glove, loose currency totaling $841, and a black hoodie were found near an air conditioning unit some twenty to forty yards from where the Petitioner was found. Near another air conditioning unit, officers found a pair of brown cargo pants, blue sweatpants, and three white gloves. Additionally, a black t-shirt and a blue hoodie were found in the general area. According to Officer Key, because it began to rain, the items were placed in brown bags and labeled. The items were transported to the police station and hung to dry in the evidence room. Once dry, the items were placed in the evidence locker.

Investigator Susan Andrews of the Union City Police Department testified that she responded to the incident at 3J's on May 15, 2014, and took photographs. Mays, 2017 WL 3841372, at *2. She also interviewed Ms. Twining and Ms. Milligan. She viewed the store's surveillance video of the robbery and attempted to get copies of the video, but the copies would not play. Investigator Andrews eventually used her camera to make a recording of the surveillance video. She then left the store and proceeded to take possession of the evidence collected around the school. She was later advised by the Tennessee Bureau of Investigation (TBI) Crime Lab to send the white gloves along with saliva samples from the Petitioner and Mr. Williams for comparison testing.

Special Agent Kristen Meyers of the TBI Crime Lab, Serology Unit, testified as an expert in the field of DNA analysis. Mays, 2017 WL 3841372, at *2. She conducted DNA analysis of the white gloves and compared them with the saliva samples from the Petitioner and Mr. Williams. She confirmed that two gloves contained a DNA profile consistent with that of Mr. Williams and that a partial DNA profile from another glove was consistent with the Petitioner's DNA. Although the partial DNA profile was consistent with that of the Petitioner, the probability of selecting an unrelated person to be included as a contributor was one in eight for the African-American population.

Sergeant Brandon Adams of the Union City Police Department testified that he and other officers drove back to the scene of the robbery on the morning of May 16, 2014, around 5:30 to 6:00 a.m. to search for a weapon. Mays, 2017 WL 3841372, at *3. He discovered a silver, chrome-plated gun lying in a ditch near the Union City Elementary School. The gun had some rust on it.

Corporal Charles Moran testified that he transported Mr. Williams to jail and stayed with both the Petitioner and Mr. Williams at the jail to complete intake paperwork. Mays, 2017 WL 3841372, at *3. He took the clothing that each man was wearing and placed

them into separate bags and delivered the clothes to Investigator Andrews. Investigator Andrews testified that she received the clothes from Corporal Moran and that the Petitioner's bag contained a pair of purple Nike tennis shoes.

Jimal Williams testified that he participated in the robbery of 3J's on May 15, 2014. Mays, 2017 WL 3841372, at *3. He said that the robbery was the Petitioner's idea and that the two had discussed the robbery for a few days prior. He asserted that he "jumped the counter" during the robbery and that the Petitioner held the gun. Id. After leaving 3J's, the two ran behind the elementary school and stopped so that Mr. Williams could change clothes. He thought the Petitioner may also have changed clothes. They left clothes and the money they had taken near "vents." Id. Mr. Williams testified that at the time of the Petitioner's trial, he had already been sentenced for aggravated robbery and three counts of aggravated assault and that in exchange for his testimony, the State recommended that he receive the minimum sentence, with the sentence to run concurrently to the sentence in another case.

In his defense, the Petitioner testified that he did not rob 3J's on May 15, 2014. Mays, 2017 WL 3841372, at *3. He said that he walked to the market to get some A + D ointment for a new tattoo that Curtis Jackson was going to finish putting on his neck that night at 10:30 p.m. He testified that he was taking a shortcut behind the school when an officer told him to freeze and he was arrested. Id. at *4.

The Petitioner identified his pants, shirt, and pullover that were taken from him at the jail. Mays, 2017 WL 3841372, at *4. He denied that any of the other clothing found at the scene belonged to him. He also denied that the shoes taken by Corporal Moran at the jail belonged to him, but insisted that he was wearing blue Vans at the time of his arrest. The Petitioner knew Mr. Williams because of a previous altercation, but it had been a "while" since he had seen Mr. Williams. Id. He said that Mr. Williams' trial testimony was not truthful.

Following his convictions, the Petitioner appealed to this court. On direct appeal, the Petitioner claimed that: (1) the trial court improperly overruled the Petitioner's objection to the jury venire; (2) the trial court improperly instructed the jury concerning possession of recently stolen property; (3) the evidence was insufficient to support the convictions; (4) and the trial court erred in denying the Petitioner's motion for a new trial based upon newly discovered evidence. Mays, 2017 WL 3841372, at *1. We affirmed. Id. at *14.

Relative to the Petitioner's first allegation, this court concluded that the Petitioner did not establish an improper jury venire. Mays, 2017 WL 3841372, at *8. First, this court held that the Petitioner had failed to show that the representation of African-Americans in

venires from which juries were selected in Obion County was not fair and reasonable as related to the number of such persons in the community. The Petitioner never established the population of African-Americans in Obion County. Next, this court determined that even if African-Americans were underrepresented in the jury venire, he had not shown that this underrepresentation was due to systematic exclusion of the group in the jury selection process because the database for selecting jurors was random selection from a list of those individuals with driver's license and identification ("ID") issued by the Tennessee Department of Safety. Id. at *9.

Relative to the jury instruction issue, this court concluded that the jury instruction for possession of recently stolen property was proper because the jury could infer that the Petitioner was in possession of said property based upon the evidence at trial. Mays, 2017 WL 3841372, at *11. This court noted that the Petitioner was found hiding approximately three hundred yards from 3J's; the Petitioner matched the description of one of the robbers; the Petitioner was still wearing a black bandana upon his arrest; and money was discovered some twenty to forty yards from where the Petitioner was found.

Relative to sufficiency, this court concluded that the evidence was sufficient to support the Petitioner's convictions. Mays, 2017 WL 3841372, at *12. Specifically, this court found that Mr. Williams identified the Petitioner as a participant of the robbery; the Petitioner and his clothing matched the description of one of the perpetrators; the recording of the surveillance depicted an individual consistent with the Petitioner's appearance; he was found within three hundred yards of 3J's; and his DNA was consistent with that of the partial DNA profile found on one of the gloves recovered near the scene. Id. at *13.

Finally, relative to the Petitioner's claim of newly discovered evidence, this court concluded that the Petitioner was not entitled to a new trial. Mays, 2017 WL 3841372, at *14. At his sentencing hearing, the Petitioner presented two letters that he claimed were written or directed to be written by Mr. Williams. In one letter, which Mr. Williams admitted writing, he said that he hoped the Petitioner would "beat" the charges and that he wished he could take his testimony back. In the second letter, Mr. Williams said his testimony at trial was a lie. However, Mr. Williams testified that he directed someone else to write the second letter because it was not truthful. This court held that the Petitioner had failed to show that the letters were material or that they would have likely changed the result of the trial.

## POST-CONVICTION HEARING

The Petitioner filed a pro se petition seeking post-conviction relief on July 23, 2018, alleging that the jury was unconstitutionally impaneled and that he was denied effective assistance by trial counsel. Following the appointment of post-conviction counsel, an amended pro se petition was filed on December 13, 2018. Therein, the Petitioner alleged that the State failed to disclose Brady material. The Petitioner also alleged that he was specifically denied effective assistance in the following ways: (1) trial counsel failed to conduct an adequate investigation of the facts; (2) trial counsel failed to secure body camera video from the arresting police officers; (3) trial counsel failed to prepare and file pretrial and post-trial motions; (4) trial counsel failed to prepare and present evidence of systematic exclusion of African-American members from the jury venire; (5) trial counsel failed to present the matter of possible recantation of trial testimony by Mr. Williams; (6) trial counsel failed to force the State to be bound by an alleged plea agreement; (7) trial counsel failed to object to introduction of the sneakers into evidence; (8) trial counsel failed to present all defenses; (9) trial counsel failed to pursue an alibi defense; (10) trial counsel failed to present an expert witness on DNA evidence; (11) trial counsel failed to object to the introduction of evidence based on the chain of custody; and (12) trial counsel failed to properly represent the Petitioner on direct appeal. The amended petition also included a motion for discovery and a post-conviction DNA petition requesting testing on the gun and the Petitioner's "blue shoes."

At the post-conviction hearing, Harry Johnson testified that he had been the Obion County Circuit Court Clerk since 2002. Mr. Johnson explained that juries were randomly selected from a jury pool comprised of those residents with an Obion County driver's license or ID. He did not recall if the jury during the Petitioner's trial was composed of all-white jurors. Similarly, he could not recall if more jurors were present on a second day of trial. On cross-examination, Mr. Johnson testified that the jury information sheets given to attorneys before trial did not designate the race of individual members of the venire. To obtain this information, the attorney would need to contact each potential juror.

Trial counsel testified that he was appointed to the Petitioner's case in October 2015. At that time, the Petitioner had already been tried once, and he was replacing original trial counsel. Trial counsel had been practicing law for approximately twenty years and had spent nineteen of those years doing criminal defense work. He estimated that he conducted four to five jury trials a year and attended continuing legal education specific to criminal law.

Trial counsel testified that he had received information sheets on jurors prior to trial. These sheets had listed the juror's names, occupations, spouse's names, and spouse's occupations. Trial counsel only became aware of the juror's races on the first day of jury selection. He noted that on that day, "there were no African-American members of the [jury] pool." Trial counsel made a motion to disqualify the jury pool because of the lack

of African-American members, and that after this motion was granted, more jurors were called to report for the second day of jury selection. However, trial counsel asserted that no African-Americans reported on the second day of jury selection. Trial counsel renewed his motion to disqualify the jury pool and requested a continuance to obtain necessary statistical information on Obion County's African-American population. However, the Petitioner "did not want to continue the case," and the Petitioner testified to as much in open court.

Trial counsel recalled receiving plea offers on behalf of the Petitioner, however, once Mr. Williams agreed to testify against the Petitioner, the offers did not continue. Trial counsel recalled that he met with the Petitioner four or five times, and that the Petitioner's family would communicate with trial counsel on a regular basis. Additionally, trial counsel received multiple letters from the Petitioner. The Petitioner had directed trial counsel to file a motion to dismiss for lack of evidence. Trial counsel explained to the Petitioner that this motion would be made at trial after the conclusion of the State's evidence. In another letter, the Petitioner had asked trial counsel to file a motion to suppress Mr. Williams' testimony. Trial counsel explained that a motion to suppress would be baseless. The Petitioner had also asked trial counsel to file a motion to suppress the gun found near the scene, but trial counsel also found this motion baseless.

Regarding a motion filed pro se by the Petitioner, trial counsel also believed that the motion to suppress the gun and shoes was meritless. Similarly, the Petitioner's pro se motion for dismissal based on a previous acquittal was deemed meritless by trial counsel. Trial counsel cross-examined Mr. Williams at trial at length. He could not recall if he had a chain of custody log for all of the evidence.

After reviewing the recording of the video surveillance playing on another device, trial counsel agreed there was some audio in the video that would not have existed in the original. Trial counsel testified that at trial the recording was "closer" and zoomed in. He did not object to the admission of the recording at trial and he testified that the video was an accurate representation of the events.

On cross-examination, trial counsel affirmed that he cross-examined witnesses regarding the Petitioner's shoe color, the color of the gun, and the identity of the Petitioner in the video. Additionally, he agreed that the shoe color discrepancy and the confusion regarding the color of the gun were also beneficial to the Petitioner's case.

Trial counsel recalled that the same plea offer extended to Mr. Williams was also offered to the Petitioner before trial. Trial counsel agreed that Mr. Williams' testimony was the most damaging to the Petitioner's case. Mr. Williams named the Petitioner during his testimony as a participant in the robbery. Additionally, trial counsel recalled that the

proof showed that the Petitioner was found with Mr. Williams behind a dumpster, and money was found within twenty to forty yards of the dumpster. The Petitioner was wearing a black bandana at that time, which was consistent with the perpetrator in the video.

Trial counsel recalled Investigator Susan Andrews' testimony that the video recording was taken on a cell phone after the original security footage could not be transferred due to technical errors. Trial counsel agreed that providing proof of the percentage of African-American residents in Obion County would not have been enough to prove systematic exclusion because this court had already ruled that the Obion County process was random and did not take race into account when pooling a jury.

Despite the Petitioner's telling trial counsel that he was getting a tattoo at the time of the incident, trial counsel testified that the Petitioner failed to provide a name or address of any potential alibi witness. Trial counsel again testified that the Petitioner did not want to continue his trial in order for trial counsel to obtain information about race in Obion County for his jury objection.

Mr. Williams testified that he received and rejected a plea offer of six years to be served at thirty percent and to run concurrently with another case. Though Mr. Williams was subsequently convicted at trial, he was approached by the State to be a witness against the Petitioner before his sentencing. Mr. Williams claimed that he was not honest at the Petitioner's trial.

Investigator Andrews confirmed that she photographed evidence at the scene and recorded video from the store's security camera. The store manager attempted to put the video on a disc twice, but she could not export the footage. Investigator Andrews gathered evidence from all officers at the scene and documented each piece on property receipts. She clarified that the gloves found at the scene were bagged separately to eliminate cross-contamination. Investigator Andrews collected each piece of evidence from officers and placed them in her storage locker. She chose not to dust or check for fingerprints on the gun because the exterior was too rusty.

Corporal Moran testified that on the night of the robbery, he responded to the area. He also collected the Petitioner's clothes at the time he was arrested. He logged the Petitioner's shoes as "blue sneakers" on a property receipt. On cross-examination, Corporal Moran affirmed that he was present when the Petitioner removed his shoes. He placed the shoes in an evidence bag along with the Petitioner's other clothing and placed the bag in the trunk of his patrol car. He delivered the bag to Investigator Andrews.

District Attorney James Cannon testified that he recalled a plea offer being made to both the Petitioner and Mr. Williams, but the offer was contingent on both accepting the

plea. The offer was withdrawn after Mr. Williams did not accept. Mr. Cannon agreed that Mr. Williams received some benefit from his trial testimony about the Petitioner.

After the conclusion of proof, the post-conviction court concluded that the Petitioner had raised the constitutional jury venire claim pretrial and post-trial and both times was denied relief. Additionally, the court observed that the Petitioner specifically stated on the record that he did not want his trial to be continued in order for trial counsel to have time to gather statistical information on the percentage of African-Americans living in Obion County. The court noted that the Petitioner had presented no new evidence to this court on direct appeal and failed to show a systematic exclusion. The post-conviction court denied relief on this issue.

Next, the post-conviction court concluded that the Petitioner presented no evidence to establish a Brady violation and denied relief. Additionally, the court found that no physical evidence relative to this case had been destroyed. The post-conviction court held that though the trial court did not direct that additional pieces of evidence be tested for DNA, the Petitioner had failed to show that exculpatory DNA testing results would have resulted in no prosecution or conviction and that the other evidence against the Petitioner was considerable.

Finally, the post-conviction court concluded that trial counsel was not ineffective and that trial counsel had been engaged in the practice of criminal law for twenty years and conducted four or five trials per year. Trial counsel was well prepared. The court noted that trial counsel fought zealously for the Petitioner when jury venire issues became apparent, but that the Petitioner testified under oath that he did not want to pursue additional information. The court found that trial counsel conducted an adequate investigation into the facts. There was no evidence to suggest that a police officer body camera video would have been exculpatory; therefore, trial counsel was not ineffective by not requesting such. Trial counsel also raised appropriate motions at the pretrial and post-trial stages and declined to file motions not supported by law or fact. Trial counsel properly handled Mr. Williams' possible recantation of his trial testimony, plea offer discussions, and the chain of custody issues. In regards to the alibi issue, the court found that trial counsel was not ineffective in his decision because the Petitioner never gave information regarding the possible alibi. Finally, the court noted that trial counsel's decisions regarding possible forensic evidence, all appropriate defenses, and direct appeal representation were not ineffective. The court denied the post-conviction petition by written order filed on January 13, 2020.

The Petitioner timely filed a notice of appeal. The case is now before us for review.

**ANALYSIS**

At the outset, the Petitioner asserts that he provided new evidence of an improper venire and should be granted relief. Next, the Petitioner argues that trial counsel was ineffective in the following ways: (1) at trial he failed to provide statistical information to show the systematic exclusion of African-Americans in the jury venire of Obion County; (2) he failed to properly examine the State's witnesses regarding the admissibility of certain evidence and failure to produce impeachment evidence; (3) and he failed to file a pretrial motion regarding the chain of custody for "tainted evidence." Finally, the Petitioner submits that the trial judge should have given more weight to Mr. Williams' recantation of his trial testimony.

The State responds that the Petitioner has previously been denied relief regarding an improper jury venire and has, additionally, failed to prove that the venire was not fair and reasonable nor that it systematically excluded African-Americans. The State asserts that counsel was effective, and that the post-conviction court "wholly discredited" Mr. Williams' testimony, and that the Petitioner should not be granted relief.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal Petitioners are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a

more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

Although trial counsel does not have an absolute duty to investigate particular facts or a certain line of defense, counsel does have a duty to make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. Strickland, 466 U.S. at 691. Counsel is not required to interview every conceivable witness. See Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). Furthermore,

> no particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

-11-

A reasonable investigation does not require counsel to "leave no stone unturned." Perry Anthony Cribbs v. State, No. W2006-01381-CCA-R3-PD, 2009 WL 1905454, at *49 (Tenn. Crim. App. July 1, 2009). Rather, "[r]easonableness should be guided by the circumstances of the case, including information provided by the Petitioner, conversations with the Petitioner, and consideration of readily available resources." Id. The United States Supreme Court has said, "[I]nquiry into counsel's conversations with the Petitioner may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." Strickland, 466 U.S. at 691.

## A. Jury Venire

Under the Sixth and Fourteenth Amendments to the Constitution, juries must be drawn from a source that is "fairly representative of the community" in which the Petitioner is tried. Taylor v. Louisiana, 419 U.S. 522, 538 (1975). No person has a constitutional right to be tried by a jury of his or her own race, either in whole or in part. Harvey v. State, 749 S.W.2d 478, 481 (Tenn. Crim. App. 1987); see also Wheeler v. State, 539 S.W.2d 812, 815 (Tenn. Crim. App. 1976). The fact that there were no African-Americans on the jury is not proof, by itself, of a violation of any right. Harvey, 749 S.W.2d at 481. To establish an improper jury venire, one must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to the systematic exclusion of the group in the jury-selection process.

State v. Nelson, S.W.2d 158, 161 (Tenn. Crim. App. 1980) (quoting Duren v. Missouri, 439 U.S. 357 (1979)).

We agree with the post-conviction court that trial counsel was not deficient in his objection to the composition of the jury venire. The record reflects that prior to the morning of jury selection, trial counsel had no way of knowing each potential juror's race. Trial counsel asserted that the information sheets given to him before jury selection did not list the potential jurors' races and that he was not aware that the jury venire was comprised of all-white individuals until the first day of jury selection. However, upon seeing a lack of racial diversity on the first day of jury selection, trial counsel made a motion to disqualify the jury because of a lack of African-American members. More jurors were called to report on the second day of jury selection; however, after no African-Americans reported that

day, trial counsel made a motion to continue in order to gather statistical information on the racial composition in Obion County. The Petitioner informed counsel that he did not want the trial continued. The Petitioner subsequently testified under oath that he did not want to delay the trial so that trial counsel would have time to gather such data to support a claim of improper jury empaneling and wished to proceed.

The Petitioner now offers evidence of the population of African-Americans in Obion County, and he raises a free-standing constitutional claim than an improper venire was impaneled. However, this court has denied relief on this issue previously. Specifically, this court held that the Petitioner failed to show that even if African-Americans were underrepresented, the jury venire process systematically excluded African-Americans. See Mays, 2017 WL 3841372, at *9. Mr. Johnson testified that potential jurors were randomly selected from all citizens who had been issued a driver's license or ID in Obion County. As this court held, this process was randomized and did not systematically exclude African-Americans.

## B. Cross-Examination

We agree with the post-conviction court that counsel was not deficient in his cross-examination of the State's witnesses, including Investigator Andrews, Corporal Moran, and Mr. Williams. Trial counsel testified that he had been practicing law for twenty years and had conducted four to five criminal trials a year during his career. He specifically testified that he cross-examined the State's witnesses about the discrepancy of the Petitioner's shoe color, the color of the gun, and the identity of the Petitioner in the video. The Petitioner does not specify what further cross-examination or impeachment would have yielded. We note that the evidence of the Petitioner's guilt at trial was overwhelming. The record supports the post-conviction court's findings that counsel's cross-examination was not deficient.

## C. Chain of Custody

Additionally, we agree with the post-conviction court that counsel was not deficient in his failure to file a pretrial motion regarding the chain of custody for the "tainted evidence." Corporal Moran testified that he placed the Petitioner's shoes in a bag and delivered them to Investigator Andrews. Investigator Andrews testified that she received the evidence directly from Corporal Moran and placed the evidence into a storage locker to which only she had access. Additionally, trial counsel testified that he believed a pretrial motion for suppression of evidence based on the chain of custody was not based in law or fact and would have been meritless. Trial counsel cross-examined the State's witnesses at trial regarding the chain of custody of the evidence. The testimony established a complete

chain of custody. The record supports the post-conviction court's finding that counsel's decision not to file a meritless motion was sound trial strategy.

### D. Recantation

Finally, we agree with the post-conviction court that Mr. Williams' testimony at the postconviction hearing purporting to recant his trial testimony was not credible. Previously, Mr. Williams had maintained that his trial testimony was truthful while at the sentencing hearing, and the post-conviction court found that Mr. Williams' sworn trial testimony was credible because it was in accordance with other credible evidence. Additionally, the issue is waived because the Petitioner failed to cite any law in his brief regarding this issue. See Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b).

### CONCLUSION

Based upon the foregoing, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE